**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Crim. No. 21-715 (RCL)** |
| | : | |
| **v.** | : | |
| | : | |
| **ERIC WATSON** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing.  For the reasons herein, the United States requests that the Court sentence (hereinafter, "the defendant" or "Watson") to a period of 141 months of incarceration, to be followed by five years of supervised release.  In support of this sentence, the government states the following.

**I.     FACTUAL AND PROCEDUREAL BACKGROUND**

On December 7, 2021, a federal grand jury empaneled in the District of Columbia returned a three-count indictment against the defendant charging her with one count of Kidnapping, in violation of 18 U.S.C. § 1201(a)(1); one count of Carjacking, in violation of 18 U.S.C. § 2119(1); and one count of Using, Carrying, Brandishing, and Possessing a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  The charges stemmed from his participation (along with that of co-defendant Lache Cuffey) in a kidnapping of a cab driver in the early morning hours of November 29, 2021, holding that victim against his will as they took him to various automated teller machines ("ATMs") in D.C. and Virginia to withdraw money from his accounts, before finally discarding that victim on the side of the road and then carjacking a completely separate individual in D.C. an hour later.

On October 3, 2022, the defendant pled guilty to Count 1 of the Indictment.  As part of that plea, the government agreed dismiss the remaining counts at sentencing and to cap its allocution at twenty-five (25) percent off the low-end of the defendant's Guidelines calculation.  In support of that guilty plea, the defendant agreed to the following factual proffer:

1.  At approximately 3:20 AM on November 29, 2021, the defendant and co-defendant Lache Cuffey were in the Columbia Heights neighborhood of Washington, D.C., when they identified the victim, A.S., who was waiting in his taxicab to pick up a fare outside of 1429 Columbia Road N.W.  Co-defendant Cuffey and the defendant, at the former's direction, entered into A.S.'s vehicle, with defendant Watson entering the rear of the vehicle and co-defendant Cuffey entering the driver's side.  Upon entering into the vehicle, co-defendant Cuffey pushed A.S. into the passenger's seat, while the defendant assaulted A.S.  Co-defendant Cuffey announced they would be driving to an unspecified location and began to drive.

2.  A.S. was taken to a quiet alleyway near the scene of the abduction, where the defendants demanded A.S.'s wallet.  A.S. informed them that it was in the glove compartment.  Co-defendant Cuffey opened the glove compartment and took the wallet and a check worth USD $250.00.  The two demanded A.S.'s personal identification number ("PIN") for various credit cards in his wallet, which included one Citi Costco credit card, one Barclays credit card, and one American Express credit card.  They also wanted to cash the check through an automated teller machine ("ATM").  At first, A.S. did not provide them with that information and expressed confusion regarding the ability to cash a check using an ATM.  At that point, the defendant grabbed the victim and pulled him into the backseat where he continued to assault him with closed fist blows to his head and neck area.  The victim ultimately succumbed and provided a PIN for the credit cards.

3.  A.S. was then driven to an ATM.  The defendants walked the victim over to the ATM and tried to withdraw money.  The transaction did not work because Defendants Cuffey and Watson were using credit cards, as opposed to debit cards.  Co-defendant Cuffey and the defendant walked the victim back to the car and the defendant assaulted him again.

4.  All three individuals then went to a second ATM.  In this instance, co-defendant Cuffey tried the bank cards herself at the ATM.  Co-defendant Cuffey was unable to successfully withdraw money from the ATM and when she came back to the car, she accused the victim of lying and the defendant began assaulting him.  A.S. pleaded with the defendants that he was not lying.

5.  The defendants then took A.S. from Washington, D.C. to a Wells Fargo branch located at 4651 King St. Alexandria, Virginia.  They walked A.S. to the ATM and ordered him to withdraw money, but again, the efforts were unsuccessful.  Defendants Cuffey and Watson then entered C-1's vehicle and drove it away.

6. As a result of the sustained assaults on his person that evening, A.S. suffered from extreme physical pain, which ultimately required medical intervention and hospitalization.

7. Approximately one hour after the aforementioned offense, the defendants took A.S.'s vehicle back into the District of Columbia and went to an Exxon Mobil gas station located at 2800 12th St. NE, in the Edgewood neighborhood. While there, they identified another individual, I.C.-M., who was at a separate pump and about to fill her car. Co-defendant Cuffey gave the defendant her firearm, after which he placed it in his satchel and exited A.S.'s car to approach I.C.-M. on foot. Then, co-defendant Cuffey drove A.S.'s vehicle to the pump where I.C.-M. and her vehicle were. Initially, the defendant began speaking with I.C.-M. casually, before co-defendant Cuffey prompted the defendant to initiate the carjacking. Acting on co-defendant Cuffey's instruction, the defendant removed the firearm from his satchel. At that point, I.C.-M. handed over the keys to her vehicle. The defendant then handed off I.C.-M.'s keys to co-defendant Cuffey, who proceeded to take I.C.-M.'s car that had previously been stopped near the pump and drove it away from the station. The defendant then took A.S.'s car and drove it a short distance, before becoming involved in an accident, at which point he abandoned A.S.'s car and fled on foot.

## II.   DISCUSSION AND RECOMMENDATION

### A.   Generally Applicable Legal Principles

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). See United States v. Gall, 128 S. Ct. 586, 596 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –

        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

            (i) issued by the Sentencing Commission ...; and
            (ii) that, . . . are in effect on the date the defendant is sentenced; ...

    (5) any pertinent policy statement –
        (A) issued by the Sentencing Commission ... and
        (B) that, . . . is in effect on the date the defendant is sentenced.

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

B.    <u>Defendant's USSG Calculation</u>

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government concurs with the USSG calculation of the U.S. Probation Office ("USPO") with respect to the Total Offense Level, Criminal History, and Guideline Range.

*1.    Total Offense Level*

The base offense level for Kidnapping a violation of 18 U.S.C. § 1201(a)(1), is governed by U.S.S.G. § 2A4.1(a) and begins at an offense level of 32. *See* PSR ¶ 28. Pursuant to U.S.S.G.

§ 2A4.1(b)(2)(B), the base offense level is increased by two points because the first victim endured seriously bodily injury during the commission of the offense. *See id.* at ¶ 29.  This results in an Adjusted Offense Level of 34.  *See id.* ¶ 33.  By entering a guilty plea, the defendant has demonstrated acceptance of responsibility for this offense, reducing her offense level by 2 points. *See id.* ¶ 35  The government agrees that the defendant has assisted authorities in the investigation of the defendant's own misconduct and is decreasing the offense by an additional 1 point. *See id.* ¶ 36.  This results in a Total Offense Level of 31.  *See* PSR ¶ 37.

> 2. *Criminal History*

The government agrees with the PSR that the defendant has accumulated a total of 15 criminal history points, placing him in Criminal History Category VI.

| Arrest Date | Charge/ Court | Disposition Date and Sentence | Guidelines | Crim. Hist. Pts. |
|---|---|---|---|---|
| 04/29/2010 | Assault on a Police Officer DC Superior Court (2010-CMD-007560) | 08/11/2010: Convicted via Court Trial – 120 days imprisonment, Execution of Sentence Suspended (ESS) to all but 15 days [credit for time served]; 12 months supervised probation | 4A1.2(e)(3) | **0** |
| 09/27/2011 | Robbery DC Superior Court (2011-CF3-018920) | 01/11/2012: 32 months imprisonment; 3 years term of supervised release (TSR) - Pursuant to the Youth Rehabilitation Act (YRA) | 4A1.1(a) | **3** |
| 6/14/2014 | Ct. 1: Attempt to Commit Robbery Ct. 2: Assault with Significant Bodily | 10/03/2014: 23 months imprisonment; 3 years TSR [concurrent | 4A1.1 | **3** |

|  | Injury<br>DC Superior Court<br>(2014-CF3-010494) | terms] |  |  |
|---|---|---|---|---|
| 12/03/2017 | Simple Assault DC Superior Court (2017-CMD-020579) | 03/07/2018: Pled guilty; 120 days imprisonment | 4A1.1(b) | **2** |
| 05/31/2019 | Simple Assault DC Superior Court (2019-CMD-007432) | 08/20/2019: 90 days imprisonment, ESS as to all but time served [29 days]; 12 months supervised probation | 4A1.1(c) | **1** |
| 07/04/2019 | Simple Assault DC Superior Court (2019-CMD-008969) | 08/20/2019: 90 days imprisonment, ESS to all but time served [12 days]; 12 months supervised probation | 4A1.1(c) | **1** |
| 07/22/2019 | Simple Assault DC Superior Court (2019-CMD-009671) | 08/20/2019: 90 days imprisonment, ESS to all but time served [29 days]; 12 months supervised probation | 4A1.1(c) | **1** |
| 09/03/2019 | Ct. 1: Simple Assault<br>Ct. 2: Theft Second Degree<br>DC Superior Court (2019-CMD-011458) | 02/02/2022: Pled guilty;<br>180 days jail [concurrent terms] | 4A1.1(b) | **2** |
| 04/22/2021 | Ct. 1: Lewd, Indecent, or Obscene Acts<br>Ct. 2: Lewd, Indecent, or Obscene Acts<br>Ct. 3: Lewd, Indecent, or Obscene Acts<br>DC Superior Court (2021-CDC-002300) | 05/24/2022: Pled guilty;<br>30 days jail [each count,<br>consecutive = 90 days aggregate sentence] | 4A1.1(b) | **2** |
|  |  |  |  | **15[1]** |

3.     *USSG Range*

The government concurs with USPO that at a Total Offense Level of 31, in criminal history

Category IV, the defendant's range under the USSG is 151-188 months.  *See* PSR at ¶99.

---

[1] The government was not aware of this conviction at the time of drafting and executing the plea agreement containing its preliminary assessment of the defendant's criminal history.  The additional two points, however, do not change the criminal history category – VI – set forth in the government's initial calculations.

C.       Analysis of the 3553(a) Factors and Allocution

In this case, sentencing is guided by the factors set forth in 18 U.S.C. § 3553(a), as identified *supra* at II.A.  A close analysis of each of those factors supports the government's recommendation that the defendant be sentenced to 141 months' incarceration, followed by five years of supervised release.

1.       *Nature and Circumstances of the Offense*

As summarized in the government's Memorandum in Aid of Sentencing with respect to co-defendant Lache Cuffey, *see* ECF No. 36, United States v. Lache Cuffey, 22-cr-151 (RCL), the kidnapping the defendant perpetrated that evening was particularly heinous and particularly brutal, involving, as it did, pouring hot coffee on the victim, taking control of the car, forcing him to withdraw money from his accounts at different ATMs, and then viciously assaulting him when he was unable to get money from said ATMs.  After leaving the battered victim on the side of the road in Alexandria, Virginia when their efforts to rob him did not bear fruit, the defendants decided to continue their criminal conduct and victimize a completely different innocent victim, when they drove back into D.C. in the first victim's vehicle, and then, in an effort to procure a new getaway car, carjacked a second individual at gunpoint.

As discussed at length in other filings, *see e.g.*, ECF No. 6, defendant and co-defendant's spree began at approximately 3:20 AM, when they walked southbound along 14th St., between Irving St. NW and Columbia Rd. NW, looking for a potential victim.



*(Fig. 1, featuring the defendant at left)*

Unfortunately, they found their victim (hereinafter, "V-1") parked in his 2015 Kia Sedona. Prior to the defendant kidnapping him, V-1 was a successful immigrant entrepreneur, running a cab service in D.C. and Virginia and was present in the 1400 block of Columbia Road NW to pick up a fare and take her to Dulles International Airport.  He would not, however, make it there. Instead, the defendants entered into his car, with the co-defendant Cuffey going to the front driver's side, pushing V-1 into the front passenger seat, while the defendant slid into the back passenger seat.  The defendant, armed with a cup of hot coffee he had just purchased at a nearby convenience store, then poured it on V-1.[2]  Based on geolocation data from V-1's phone that law enforcement

---

[2] The government understands the defendant's objection to the inclusion of this information in the PSR given that it was not included in the Statement of Offense, but nevertheless, this information was detailed at length in the government's Memorandum in support of Pre-trial Detention (ECF No. 6) and there is sufficient corroboration for the victim's account given that the video footage showing the defendant purchasing the coffee immediately prior to abducting the decedent.

later recovered and cell site location data for the defendant Cuffey's phone number, co-defendant Cuffey then drove V-1's vehicle for a short period of time to nearby Mt. Pleasant, where she parked it in an alleyway, at which point he and his co-defendant began demanding V-1's wallet, then the personal identification numbers ("PINs") for the cards in the wallet, which included one Citi Costco credit card, one Barclays credit card, and one American Express credit card. The co-defendant had also spotted a check made out to V-1 that was in the glove compartment and that she and the defendant had wished to cash at an ATM. At first, V-1 did not provide them with that information and expressed confusion regarding the ability to cash a check using an ATM. At that point, the defendant grabbed the victim and pulled him into the backseat where he continued to assault him with closed fist blows to his head and neck area while also strangling him with a scarf. The victim ultimately succumbed and provided a PIN for the credit cards.

After approximately ten minutes in the alleyway, the defendant began to drive the victim to various ATMs, first in NW D.C., and then, after crossing the Potomac River, in Alexandria, VA. At the first ATM, likely a Chase ATM located in the 1700 block of Columbia Rd. NW in Adams Morgan[3], the defendant and co-defendant walked V-1 up to the machine, forced him to insert his cards, and when he was unable to successfully withdraw money (they were using credit cards, not debit cards), took him back to the car where Watson savagely beat him in the backseat. This process was repeated one additional time, at another bank, and yet again, the victim was taken back to his car, where he was accused of lying to the defendant and co-defendant about his PINs, before defendant Watson beat him once more.

The defendants then drove V-1 to Alexandria, Virginia, where they approached a Wells Fargo ATM on Kings Road at 4:35 a.m., just over an hour into the ordeal. Both defendants took

---

[3] Records obtained during the course of the investigation show that at least one of C-1's credit cards, the Barclays credit card, was used at a Chase ATM located at 1777 Columbia Road NW, Washington, D.C. at 3:47 AM EST.

the victim to the ATM and, once more, forced him to insert his cards into the ATM



*Fig. 2 – V-1, Eric Watson, and Lache Cuffey at the Wells Fargo ATM on Kings Street in Alexandria*

At this point, with three unsuccessful efforts made to drain money from his bank accounts, the defendants decided to abandon the now badly beaten victim on the side of the road by the ATM, while driving off with his vehicle. The victim was found by a Good Samaritan wandering on Kings Street, seemingly unable to see and disoriented. Fortunately, he was rushed to a nearby hospital and treated for his injuries.



*Fig. 3 – Victim at the hospital*

The defendants then drove V-1's car back into D.C., at which point they apparently realized they needed to dispose of V-1's car and find themselves a new one. Thus, they ultimately took V-1's vehicle to the Edgewood neighborhood of Washington, D.C. They pulled up to a pump at the Exxon Mobil station located at the 2800 block of 12th St. NE, where defendant Watson got out of the car briefly to purchase items in the convenience store, before returning to V-1's car and speaking with Cuffey. After approximately 60-90 seconds, Watson exited the front passenger seat with a firearm in tow and placed it in a satchel strapped across his chest. Watson can be seen on surveillance footage walking away from the vehicle. A short time thereafter, Cuffey took V-1's vehicle and drove it in the direction Watson had been walking.



*Fig. 4 – Watson exiting with firearm, Cuffey remains in driver's seat*

Another individual (hereinafter, "V-2"), was at another set of pumps just around the corner from where the defendants had taken V-1's car and in the direction of which Watson had been caught on surveillance footage walking. V-2 was putting in her credit card at the pump and later told law enforcement agents that V-2 had seen Defendants Cuffey and Watson in a black car. While V-2 was at the gas pump, Watson approached V-2 told the V-2 that he wanted to marry her,

at which point, Cuffey, becoming impatient at how long her co-defendant was taking to commit the armed carjacking, yelled out "Eric," encouraging him to get on with it. Watson then brandished a firearm, at which point V-2, as she would later recount, simply handed over the keys to her car. Watson then gave the keys to Cuffey, who drove the V-2's car away from the station. Watson then re-entered V-1's vehicle and fled the scene, ultimately crashing it nearby.

As a result of his conduct that evening, the defendant left one victim physically battered and both victims psychologically traumatized. V-1's injuries are, of course, immediately apparent, but less obvious are the other ramification's Watson's conduct has had on his life. V-1 has since stated that he was too frightened to resume his cab business after what had happened to him while simply attempting to do his job and left work for more than a year to recover. He remains, as of the date of this filing, unwilling to address the Court and discuss what happened to him and share its impact on his life, out of fear of retribution.[4] With respect to V-2, as this Court is well aware having read her victim impact statement in connection with the sentencing of the co-defendant and heard from her directly at that proceeding, she too was deeply psychologically scarred by this event, taking several months in her efforts to recover after having had a firearm pointed directly at her while having her car – which she used to earn supplemental income as a Lyft driver -– taken from her for a period of time.

## 2.    *Defendant's History and Characteristics*

As detailed at length in the government's memorandum in support of pre-trial detention, ECF No. 6 at 19-22, the defendant has accumulated no fewer than eight criminal convictions as an adult for violent assaultive conduct. This unfortunate criminal history reached its crescendo on November 29, 2021, when he brutally beat V-1 and brandished a firearm at V-2.

---

[4] The government will make additional efforts to verify that it remains his wish not to address the Court at sentencing.

The defendant's first adult felony conviction came in 2011 in D.C. Superior Court for a matter not unlike this one in which he violently robbed a complete stranger in concert with another co-defendant. *See* ECF No. 6 at 19. As detailed in the statement of offense in support of the defendant's guilty plea that the government included in its Memorandum in Support of Pretrial Detention, *see id.* at 20, the defendant and his co-defendant in that matter simply identified their mark waiting at a bus stop before confronting him, physically taking his belongings, and then, to wit, following him after the actual robbery had been accomplished and continuing to beat him. *Id.* While the defendant received a not insignificant carceral sentence for a youthful offender – 32 months' incarceration – his time in prison did almost nothing to deter him. Indeed, just over four months after his release from the Bureau of Prisons in that matter, the defendant committed yet another violent assault of a complete strange that ultimately led to a second felony conviction. *See* PSR ¶¶ 40-41. In this case, as set forth in the factual proffer in support of the guilty plea in that matter (included in the government's pre-trial detention memorandum), the defendant yet again homed in on a target to take violently take advantage of – this time a patron at a night club who was stumbling to the bathroom – and followed him in, assaulted him, took his wallet, before attempting to escape. ECF No. 6 at 20-21. Once more, the defendant received a significant carceral sentence of 23 months, but yet again, this did little to deter him from further assaultive conduct.

Indeed, in 2017, mere weeks after being released from custody on that 2014 felony conviction, he again violently assaulted another individual by repeatedly punching him in the face at a store on 14th Street. *See* PSR at ¶ 42.

In 2019 alone, the defendant was arrested, charged, and convicted of engaging in a string of unprovoked assaults against different strangers, including a woman walking to her apartment

(PSR ¶ 43), a man waiting for the bus (PSR ¶ 44), and another inmate he happened to be housed with at the D.C. Superior Court cellblock (PSR ¶ 45).  The Defendant entered guilty pleas to all three Simple Assault cases and was ultimately released after his misdemeanor convictions in August 2019.  Yet again, however, the deterrent effect of this period of incarceration was essentially non-existent, as only weeks after release, the defendant engaged in more violent conduct, this time going to an individual's apartment, demanding a laptop, forcing entry, and taking a watch and multiple cell phones.  *See* PSR ¶ 46.

Unfortunately, even a cursory read of the PSR reveals the seeming origins of so much of the defendant's violent and assaultive conduct that evening in November 2021.  As is made clear in the PSR as well as the sealed filings submitted by the defendant, the defendant has experienced severe trauma throughout his life, particularly in his upbringing.  *See* PSR ¶¶ 69-72.  Defendant has also struggled immensely with ongoing substance abuse and mental health issues, which have been covered extensively elsewhere, *see* ECF No. 30 at 4-9; *see also* PSR ¶¶ 91-100.  While the government appreciates these issues – and has been aware of them for some time – these factors have already been accounted for in both the government's plea offer and allocution, which call for a sentence that is already twenty-five percent *below* the recommended USSG range for a repeat violent offender and dismisses Count 3, which would have led to the defendant serving seven additional years in federal prison.

3.    *Need for the Sentence Imposed*

As noted above, in evaluating the "need for the sentence imposed" under 18 U.S.C. § 3553(a)(2), the Court should consider a sentence that "reflect[s] the seriousness of the offense, promote[s] respect for the law, and [] provide[s] just punishment for the offense; [] afford[s] adequate deterrence to criminal conduct; [] protects the public from further crimes of the

14

defendant; and [] provide[s] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). Here, all of these considerations point in favor of a sentence of 141 months of incarceration.

The defendant terrorized two different innocent victims across two different jurisdictions, within the span of two hours in the early morning of November 29, 2021. While – as was acknowledged in the statement of offense, the PSR, and in the government's sentencing memorandum for co-defendant Cuffey – Cuffey was providing instructions and directions to the defendant throughout the commission of both crimes, ultimately it was the defendant who was exclusively responsible for the violence visited upon V-1 and it was the defendant who was the one who took the firearm and brandished it on V-2. The defendant committed this offense after multiple adult convictions for violent conduct and multiple separate periods of incarceration ranging from 15 days to 32 months. Yet none of these periods of incarceration, none of the efforts to address the defendant's substance abuse and mental health issues, and none of the prior periods of post-trial supervision were sufficient to deter the defendant from continuing to commit violent criminal acts. Ultimately, as has been proven by the last decade's worth of random, innocent victims whom the defendant has assaulted without provocation, the public must be protected from the defendant and the only way to accomplish this statutory objective is through a period of lengthy incarceration.

While the aforementioned factors might suggest a far harsher sentence than the one the government has proposed, there are factors in mitigation. Indeed, the defendant wished to accept responsibility for these offenses at almost the earliest opportunity possible; the defendant has expressed sincere remorse for the harm he has caused; the available evidence shows that he was, in essence, acting the direction of another individual who appears to have manipulated him; there

were and remain mental health and substance abuse issues that made him vulnerable to such manipulation in the first place; and there are additional reasons on which the government will expound in a subsequent sealed filing.

While the defendant is of course entitled to ask for a variance from the USSG range under his plea agreement, 141 months' incarceration is already sufficiently lenient to address any factors in mitigation.  As noted above, the government's allocution already accounts for the defendant's early acceptance of responsibility; the difficulties that have plagued his life and (somewhat) mitigate his horrific conduct that evening; and other factors that will be discussed in a separate sealed filing.  Nevertheless, the government would note that it is allocuting well-below the defendant's USSG range.  In addition, under the plea agreement, the government will be dismissing Count 3 for the defendant's brandishing a firearm during the carjacking, which would require the Court to sentence the defendant to a term of at least seven years, *consecutive* to the sentence he would receive for the federal kidnapping charge alone.  The Court need not confer any additional benefit on the defendant by virtue of her plea of guilty in this case.

4.      *Need to Avoid Unwarranted Disparities*

A sentence of 141 months would be closer to the mainstream of sentences for this type of offense and this type of criminal history than the defendant's recommended sentence of 84 months, as evidenced by the below statistics from the U.S. Sentencing Commission.  As such, if the Court were to adopt the government's recommendation, no unwarranted disparities would be created.



### 5. Restitution

Restitution in this case and in that of the co-defendant is discretionary, not mandatory.[5] The Court should delay a final determination of the amount of any loss to V-1 and V-2 for 90 days following the sentencing hearing to give the government and V-1 and V-2 sufficient time to calculate the amount of those expenses. See 18 U.S.C. § 3664(d)(5). Given that the 90-day period has almost elapsed for the co-defendant, who was sentenced by this Court on March 10, 2023, the government anticipates submitting a joint request for discretionary restitution for both defendant's next week. The defendant's final restitution payment must be made to the Clerk of the Court.

### III.    CONCLUSION

WHEREFORE, for the foregoing reasons and the reasons in the government's sealed filing, the Court should sentence the defendant to a total of 141 months' incarceration, followed by five years of supervised release, and order her to pay restitution in an amount to be determined. Such a sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing.

---

[5] In the sentencing memorandum for co-defendant Lache Cuffey, the government incorrectly suggested that restitution was mandatory in this case. It is not.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     /s/ *Will Hart*_____
        Will Hart
        D.C. Bar No. 1029325
        Assistant United States Attorney
        United States Attorney's Office for D.C.
        601 D. St. NW
        Washington, D.C. 20530
        Email: William.hart@usdoj.gov
        Phone: (202) 730-5711